FILED
2021 Oct-28  PM 04:04
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

ADRIAN DE'ARIS DUNNING,      )
                        )
       Plaintiff,         )
                        )
v.                       )     Case No. 2:18-cv-01895-LCB-SGC
                        )
R. GADSON, *et al.*,       )
                        )
       Defendants.      )

## REPORT AND RECOMMENDATION

Adrian De'Aris Dunning filed a *pro se*[1] complaint pursuant to 42 U.S.C. § 1983, alleging violations of his rights under the Constitution or laws of the United States.  (Doc. 1).[2]  Dunning names seven correctional officers as defendants: Brandon Mitchell, Roderick Gadson, Zackery McLemore,[3] Raymond Gaines, Troy Hart, Clifton Sanders, and Keller Speaks.  (Doc. 1 at 1–2).  Dunning alleges the defendants—sued in their individual capacities for monetary damages—seriously injured him by using excessive force on July 6, 2018.  (Doc. 1 at 2–3, 5, 11–13).  In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(1), the court

---

[1] Counsel subsequently appeared and filed two motions on Dunning's behalf.  (Docs. 26-28).  However, Dunning filed an additional *pro se* pleading after counsel appeared.  (Doc. 30).

[2] Citations to the record refer to the document and page numbers assigned by the court's CM/ECF electronic document system and appear in the following format: (Doc. __ at __).

[3] Gadson and McLemore are misidentified in the complaint as "R. Gadsden" and "T. McClemore." (Doc. 1 at 1–2).

referred this matter to the undersigned magistrate judge for a report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136 (1991). As explained below, the undersigned concludes the defendants' motion for summary judgment is due to be denied as to Dunning's excessive force claims, but granted in all other respects. (Doc. 21; *see* Doc. 22).

## I.   PROCEDURAL HISTORY

On April 15, 2019, the court ordered the defendants to file a special report addressing Dunning's factual allegations. (Doc. 9 at 1, 5). The order noted the special report could be submitted under oath or accompanied by affidavits and, if appropriate, would be considered as a motion for summary judgment under Rule 56 of the *Federal Rules of Civil Procedure*. (Doc. 9 at 5–6, 9).

On July 15, 2019, the defendants filed a special report, supplemented by affidavits and other evidence. (Doc. 21). The undersigned notified the parties the court would construe the special report as a motion for summary judgment and ordered Dunning to submit any response—by filing affidavits or other materials—within 21 days. (Doc. 22). The order also advised Dunning of the consequences of any default or failure to comply with Rule 56. *Id.*; *see Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985). Dunning filed a *pro se* response which he supplemented with a subsequent *pro se* filing. (Docs. 25, 30). Between these two *pro se* pleadings, counsel appeared for Dunning and filed two motions, both of which

were denied.  (Docs. 26-29, 32).  The counseled motion for preliminary injunction includes an affidavit from Dunning which is relevant to the issues presented on summary judgment.  (Doc. 27-1).  This matter is now before the court on the defendants' motion for summary judgment and Dunning's responses.

## II.   STANDARD OF REVIEW

Because the court has construed the defendants' special report as a motion for summary judgment, Rule 56 governs.  Under Rule 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In making that assessment, the court must view the evidence in a light most favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Chapman v. AI Transp.,* 229 F.3d 1012, 1023 (11th Cir. 2000).  The moving party bears the burden to establish prima facie entitlement to summary judgment by showing the absence of genuine issues of material fact and that he should prevail as a matter of law.  *See Clark v. Coats & Clark, Inc*., 929 F.2d 604, 608 (11th Cir. 1991).  Unless the plaintiff, who carries the ultimate burden of proving his action, can show some evidence with respect to each element of his claim, all other issues of fact are immaterial, and the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986); *Bennett v. Parker*, 898 F.2d 1530, 1532–33 (11th Cir. 1990).  As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett*, 898 F.2d at 1532 (citations omitted).

However, any "specific facts" pled in a *pro se* plaintiff's sworn complaint must be considered in opposition to summary judgment. *See Caldwell v. Warden, FCI Talladega,* 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). Courts construe *pro se* complaints more liberally than pleadings drafted by lawyers. *Hughes v. Rowe*, 449 U.S. 5, 9 (1980). A *pro se* pleading "is held to a less stringent standard than a pleading drafted by an attorney" and is liberally construed. *Jones v. Fla. Parole Comm'n*, 787 F.3d 1105, 1107 (11th Cir. 2015). Here, while Dunning's complaint, response to the defendants' motion for summary judgment, and supplement thereto were filed *pro se*, counsel subsequently appeared for Dunning. The docket sheet lists Richard Allan Rice as plaintiff's counsel of record, as he has not sought to withdraw from representing Dunning. However, because the pleadings relevant to the instant motion were filed *pro se*, and because Mr. Rice has not filed any additional pleadings

since his motions were denied, the undersigned will apply the standard for *pro se* filings.

## III.   SUMMARY JUDGMENT FACTS

Although not its exclusive focus, this lawsuit largely concerns Dunning's claim for excessive force arising from a July 6, 2018 incident.[4]  This report summarizes the facts Dunning presents regarding the alleged excessive force separately from the facts presented by the defendants, highlighting the genuine dispute regarding the facts material to resolving the excessive force claim.

### A.   Dunning's Allegations Regarding the Assault

At about 10:45 A.M. on July 6, 2018, Gadson, McLemore, Gaines,[5] and Speaks opened Dunning's cell.  (Doc. 1 at 11).  An officer sprayed Dunning with a chemical agent, and the officers beat Dunning with their feet, fists, and batons.  (Doc. 1 at 11).  The officers dragged Dunning from his cell into the dayroom, where the beating continued.  (Doc. 1 at 11).  One of the officers called for assistance over the radio.  (Doc. 1 at 11).  As the officers assaulted Dunning, one of them said, "Drag

---

[4] Dunning states the events occurred on July 5, 2018.  (Doc. 1 at 11).  However, the incident reports and Dunning's body chart indicate it occurred on July 6, 2018.  (Doc. 21-1 at 2–5).

[5] Gaines attests he was working in another area when he responded to officers' call for help (the "Code Red") and Dunning was already restrained when he arrived at the scene.  (Doc. 21-6 at 1).

that b**** back into the cell." (Doc. 1 at 11). Joined by Hart,[6] Mitchell,[7] and Sanders,[8] the officers attempted to drag Dunning, but he held onto a door while the beating continued. (Doc. 1 at 11). Dunning feared for his life and believed the officers were going to kill him.

Dunning "caught a second wind of strength," got to his feet, and ran upstairs to the top tier. (Doc. 1 at 11). Several officers followed him. (Doc. 1 at 11). Dunning climbed over the railing in an attempt to "drop back downstairs," but McLemore hit his hand with a baton, causing him to fall over 12 feet to the floor below.[9] (Doc. 1 at 11–12). Dunning attempted to run, but several of the officers surrounded him and began beating him again. (Doc. 1 at 12). Officer Stead, a non-party, approached the officers and screamed for them to stop assaulting Dunning. (Doc. 1 at 12). Dunning asserts Stead saved his life. (Doc. 1 at 12).

### B.    The Defendants' Special Report

McLemore, Gadson, and Speaks were delivering food to inmates' cells on

---

[6] Like Gaines, Hart avers he was working in another area when he responded to the Code Red; by the time he arrived at the scene, Dunning was already restrained. (Doc. 21-7 at 1).

[7] Mitchell states he was assigned to a different area of the prison when he responded to the Code Red. (Doc. 21-5 at 1). Mitchell contends the extent of his involvement with Dunning was assisting officers in handcuffing him before returning to his assigned post. (Doc. 21-5 at 1).

[8] Sanders contends he was assigned to a different area of the prison on July 6, 2018, and did not respond to the Code Red. (Doc. 21-8 at 1). Sanders claims he was called to the Shift Office and instructed to escort Dunning to UAB Hospital for medical treatment. (Doc. 21-8 at 1).

[9] McLemore avers he ordered Dunning to climb back over the railing and lie on the floor but Dunning stated he would make officers kill him, before jumping off the rail. (Doc. 21-2 at 2).

July 6, 2018.  (Doc. 21-2 at 1; *see* Doc. 21-3 at 1).  The defendants contend that when they opened Dunning's cell door, he rushed out wielding a sharpened broom handle approximately three and a half feet long.  (Doc. 21-2 at 1).[10]  Dunning used the broom handle as a spear to stab McLemore's chest, catching the top of his vest trauma plate—approximately two inches below McLemore's neck and throat.  (Doc. 21-2 at 1; *see* Doc. 21-3 at 1; Doc. 21-4 at 1).  Gadson struck Dunning several times with his baton.  (Doc. 21-3 at 1).  Dunning then pushed McLemore into the wall under the stairwell.  (Doc. 21-2 at 1).  McLemore sprayed Dunning's face with a one-second burst of chemical agent to no avail.  (Doc. 21-2 at 1).  McLemore attempted to take the broom handle from Dunning, but Dunning broke his grasp and continued to stab McLemore.  (Doc. 21-2 at 1–2).  McLemore struck Dunning on the left forearm several times, but Dunning continued to assault him.  (Doc. 21-2 at 2).  Fearing for his life, McLemore struck Dunning in the head area, but Dunning stepped back and ran toward the stairs.  (Doc. 21-2 at 2).  Gadson administered more baton strikes before Dunning ran upstairs.  (Doc. 21-3 at 1).

Speaks and Gadson chased Dunning upstairs, and Speaks gave several verbal orders to stop and lie face-down on the ground; Dunning failed to comply.  (*See* Doc. 21-4 at 1; Doc. 21-2 at 2).  Meanwhile, McLemore took a different path upstairs to cut off Dunning's escape route.  (*See* Doc. 21-2 at 2).  As he ran toward Dunning,

---

[10] Dunning denies possessing a weapon or acting aggressively.  (Doc. 27-1 at 4).

McLemore gave him several direct orders to lie down with his hands behind his back; Dunning climbed over the railing instead.  (Doc. 21-2 at 2).

After Dunning fell from the top tier, McLemore and Speaks ran down the stairs and saw Dunning pick up the broom handle.  (Doc. 21-2 at 2; Doc. 21-4 at 1). McLemore and Speaks gave Dunning several direct orders to drop the weapon, but Dunning refused and ran toward McLemore.  (Doc. 21-2 at 2; *see* Doc. 21-4 at 1). McLemore again administered a burst of chemical agent to Dunning's face, but Dunning continued to advance on him.  (Doc. 21-2 at 2).  McLemore administered several baton strikes to Dunning's arms, shoulders, back, and legs.  (Doc. 21-2 at 2). Speaks struck Dunning's lower body area with his baton and again ordered him to drop the weapon.  (Doc. 21-4 at 2).  Dunning eventually dropped the broom handle. (Doc. 21-2; *see* Doc. 21-4 at 2).

McLemore engaged Dunning to get him to the floor; his first attempt was unsuccessful, and Dunning hit him in the face with a closed fist.  (Doc. 21-2 at 2). McLemore hit Dunning's face with several palm heel strikes and took him to the ground.  (Doc. 21-2 at 2).  McLemore attests Dunning flipped him over and kicked him in the facial area as he tried to get back to his feet, but McLemore was able to gain control of Dunning with the help of several officers.  (Doc. 21-2 at 2). Officers handcuffed Dunning's hands behind his back and escorted him to the infirmary. (Doc. 21-4 at 2).  Officers assisted McLemore to the infirmary; he was evaluated by

medical staff, who found no severe injuries.  (Doc. 21-2 at 2).

### C.   Remaining Allegations

Prison medical staff examined Dunning, noting: (1) lacerations to his arms, heel, and head; (2) two puncture wounds to his left hand; (3) whelps on his left arm and back; (4) a contusion to his mid-right back; and (4) abrasions to his right leg and left lower back.[11]  (Doc. 21-1 at 4).  An ambulance transported Dunning to UAB Hospital.  (Doc. 1 at 12).  Hospital staff intubated Dunning in the emergency department due to his combativeness and refusal to remain still while trying to conduct imaging.  (Doc. 25-1 at 15, 22).  Imaging revealed Dunning sustained a metacarpal fracture and left fibular fracture; he also sustained nasal bone and septum fractures.  (Doc. 25-1 at 15, 27).  Dunning underwent surgery to place a steel plate in his left hand, and casts were placed on his arm and leg.[12]  (Doc. 25-1 at 65; Doc. 1 at 12; Doc. 10 at 1).  He was also placed on a "breathing machine" and remained in this condition until July 10, 2018.  (Doc. 1 at 12).

According to hospital records, Dunning reported a history of paranoid schizophrenia and that he felt paranoid.  (Doc. 25-1 at 67).  He further reported auditory hallucinations of voices telling him officers were trying to hurt him.  (Doc.

---

[11] According to the body chart, Dunning told medical staff he had an "episode" and needed mental healthcare.  (Doc. 21-1 at 4).

[12] Dunning claims he was placed in a medically induced coma to undergo surgeries to his hand, leg, and arm, but hospital records show only hand surgery.  (Doc. 1 at 12; Doc. 25-1 at 65–66).

25-1 at 67).   Due to Dunning's paranoia and auditory hallucinations, hospital psychiatric staff recommended discontinuing Seroquel and starting Risperdal, Haldol, Ativan, and Benadryl as needed for agitation.  (Doc. 25-1 at 15).

On July 10, 2018, Dunning was released from UAB and transported back to prison.  (Doc. 1 at 13).  He was promised physical therapy but did not receive it once he returned to prison.  (Doc. 1 at 13).  Instead, Dunning remained in the prison infirmary until July 22, 2018; he received medical care for wound cleaning and blood pressure checks.  (Doc. 1 at 13).  Dunning was later transferred to the Mental Health Segregation Unit, where he taught himself how to walk again, but he could not stand for long periods of time.  (Doc. 1 at 13).

Jeffery Baldwin investigated the July 6, 2018 incident; he interviewed McLemore, Gadson, Speaks, and Dunning and reviewed Dunning's written statements.   (Doc. 21-1 at 6).   On September 27, 2018, Baldwin issued an Investigative Report finding the officers' use of force against Dunning was justified due to Dunning's "active aggressive assaultive behavior." (Doc. 21-1 at 6).  Baldwin found Dunning used a broom handle as a weapon and fashioned a protective vest out of his mattress. (Doc. 21-1 at 6).  Baldwin concluded the officers used an appropriate amount of force to control Dunning. (Doc. 21-1 at 6).

In September 2018, Dunning was released back into general population. (Doc. 1 at 13).  On October 24, 2018, Dunning was reassigned to segregation.  (Doc.

1 at 13).  Prison officials did not tell Dunning why they placed him in segregation, but he assumed it was related to the July 6, 2018 incident and his family's complaints to ADOC.  (Doc. 1 at 13).  On November 30, 2018, Dunning received a "12 Hour Advance Notification of Pending Reclassification," in which prison officials stated a reclassification team would consider a change in his custody and/or institutional assignment.  (Doc. 27-2 at 2).  The notice also informed Dunning the possible reclassification was due to an Investigations & Intelligence report to Ms. Bonner— a "Classification Supervisor"—that Dunning was facing a pending attempted murder charge for striking McLemore in the chest with a broken broom handle on July 6, 2018.  (Doc. 27-2 at 2).

On December 11, 2018, Hearing Officer Hayes conducted a "due process hearing" concerning Dunning's custody.  (Doc. 27-2 at 4).  During the hearing, Bonner presented evidence on behalf of the State, and Dunning was given an opportunity to give testimony on his own behalf.  (Doc. 27-2 at 4).  Thereafter, Hayes recommended Dunning's custody be changed to Medium Restrictive Housing.  (Doc. 27-2 at 4).  In August 2019, Dunning sent inmate request slips to Warden Givens asking why he had been placed in segregation; Givens responded that she would forward the requests to Bonner.  (Doc. 27-4 at 2-3).

## IV.   ANALYSIS

Dunning's claims fall into two categories: (1) excessive force regarding the

July 6, 2018 incident; and (2) retaliation and due process violations due to his placement in segregation.  Each category of claims is addressed in turn.

## A.   **Excessive Force**

Dunning's excessive force allegations are subject to the standard set forth by the Supreme Court in *Hudson v. McMillian*, 503 U.S. 1 (1992), and *Whitley v. Albers*, 475 U.S. 312 (1986).  *See Campbell v. Sikes*, 169 F.3d 1353, 1374-75 (11th Cir. 1999).  In *Hudson*, the Court held "the core judicial inquiry" in an inmate's excessive force claim "is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson*, 503 U.S. at 6-7.  In extending *Whitley* to all cases concerning prison officials' use of force, the Court reasoned:

> Many of the concerns underlying our holding in *Whitley* arise whenever guards use force to keep order.  Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need to maintain or restore discipline through force against the risk of injury to inmates.  Both situations may require prison officials to act quickly and decisively.  Likewise, both implicate the principle that prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

*Hudson*, 503 U.S. at 6 (citations and quotations omitted) (alterations incorporated).

With these concerns in mind, the Supreme Court set out the following factors to consider when examining whether a use of force was excessive: (1) the need for application of force; (2) the relationship between that need and the amount of force

used; (3) the threat reasonably perceived by the responsible official; (4) any efforts to temper the severity of a forceful response; and (5) the extent of the injury suffered by the inmate. *Whitley*, 475 U.S. at 321.  In applying these factors to the facts of a particular case, the Court has instructed:

> That is not to say that every malevolent touch by a prison guard gives rise to a federal cause of action.  The Eighth Amendment's prohibition of "cruel and unusual" punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort "'repugnant to the conscience of mankind.'"

*Hudson*, 503 U.S. at 9–10 (citations omitted).  Thus, to create a genuine issue of material fact, a plaintiff must present evidence sufficient to reasonably infer a defendant acted maliciously and sadistically.  Generally, courts "do not second-guess prison officials on matters that they are better equipped to handle under the exigencies of an internal disturbance."  *Wilson v. Blankenship*, 163 F.3d 1284, 1295 (11th Cir. 1998).

Dunning contends in his sworn complaint that the defendants assaulted him on July 6, 2018, "without just cause or provocation," and denies elsewhere that he had a weapon.  (Doc. 1 at 11–12; Doc. 27-1 at 4).  Dunning alleges that Gadson, McLemore, Gaines, and Speaks opened his cell door and one of the officers sprayed him with a chemical agent and all of the officers beat him with their feet, fists, and batons.  (Doc. 1 at 11).  He alleges the officers dragged him into the dayroom, where Hart, Mitchell, and Sanders joined in the beating.  (Doc. 1 at 11).  Construing the

13

facts in a light most favorable to Dunning, the defendants intentionally and maliciously attacked him. Moreover, no force was needed to restore or maintain discipline since Dunning did not pose a threat to the defendants. Dunning claims he feared for his safety and admits he attempted to run away from the officers; he maintains he did not pose a threat and the defendants' use of force was unwarranted. (Doc. 25 at 9–10; Doc. 27-1 at 4). Dunning alleges his injuries were the direct result of this unjustified use of force.

On the other hand, the defendants contend Dunning possessed a broken broom handle, fashioned a vest from a mattress, and attacked McLemore when he entered Dunning's cell. (Doc. 21-2 at 1; Doc. 21-3 at 1; Doc. 21-4 at 1; Doc. 21-1 at 6). The defendants acknowledge using force against Dunning due to his alleged attack on McLemore. (Doc. 21-2 at 1–2; Doc. 21-3 at 1). They further aver that Dunning disobeyed multiple orders to lie down and instead attempted to evade officers by running upstairs, climbing over a railing, and falling to the floor below. (Doc. 21-4 at 1; Doc. 21-2 at 2). The defendants claim Dunning then picked up the weapon and continued to disobey orders, so they hit him with their batons until he dropped the weapon and was subdued. (Doc. 21-2 at 2; Doc. 21-4 at 1-2).

Assessing the credibility of the allegations made by a plaintiff or a defendant is beyond the scope of a trial court's ruling on a motion for summary judgment. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also, Mize v.*

*Jefferson City Bd. of Educ.*, 93 F.3d 739, 742–43 (11th Cir. 1996). Here, the parties have presented evidence showing a genuine dispute between Dunning's and the defendants' version of the facts material to resolving the excessive force claim. These divergent facts are sufficient to preclude summary judgment on this claim.

The defendants argue they are entitled to qualified immunity regarding Dunning's excessive force claims. (Doc. 21 at 19–20). "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (quotation marks and citations omitted). To obtain qualified immunity, the government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quotation marks and citations omitted). "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id*. The plaintiff must show that "(1) the defendant violated a constitutional right, and (2) this right was clearly established at the time of the alleged violation." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1264 (11th Cir. 2004) (footnote omitted).

There is no dispute that the defendants were acting within the scope of their discretionary authority on July 6, 2018.  Because there is a question of fact concerning whether the defendants used excessive force against Dunning, the defendants are not entitled to qualified immunity.  Specifically:

> a defense of qualified immunity is not available in cases alleging excessive force in violation of the Eighth Amendment, because the use of force "maliciously and sadistically to cause harm" is clearly established to be a violation of the Constitution . . . . There is simply no room for a qualified immunity defense when the plaintiff alleges such a violation.  The only question, then, is whether the plaintiff has alleged facts sufficient to survive a . . . motion for summary judgment.  If he has done so, that is the end of the inquiry.

*Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002) (citations omitted).

Because Dunning has presented facts sufficient to survive a motion for summary judgment concerning his Eighth Amendment excessive force claim against the defendants, their motion for summary judgment—including the assertion of qualified immunity—is due to be denied.

## B.   <u>Retaliation & Due Process Claims</u>[13]

Dunning alleges that, after releasing him into general population in September 2018, prison officials reassigned him to segregation on October 24, 2018.  (Doc. 1 at 13).  Although he claims prison officials did not provide a reason for his reassignment to segregation, he suspects it is related to the July 6, 2018 incident and

---

[13] Dunning's claims for retaliation and due process violations were the subject of the motion for preliminary injunction filed by counsel of record, which the court denied.  (Docs. 27, 32).

his family members' complaints to ADOC.  (Doc. 1 at 13).  To the extent Dunning alleges the defendants retaliated against him due to family members' complaints or that his placement in segregation violates due process, his claims fail.  (Doc. 25 at 64, 66–67).

The undisputed evidence shows prison officials notified Dunning on November 30, 2018, that a reclassification team would consider a change in his custody and/or institutional assignment.  (Doc. 27-2 at 2).  The notice informed Dunning the inquiry was motivated by a report to Ms. Bonner, a "Classification Supervisor," that Dunning was facing a pending charge for attempted murder of an officer.  (Doc. 27-2 at 2).  On December 11, 2018, Hearing Officer Hayes conducted a hearing concerning a change in Dunning's custody.  (Doc. 27-2 at 4).  During the hearing, Bonner presented evidence on behalf of the State, and Dunning had an opportunity to testify on his own behalf.  (Doc. 27-2 at 4).  Thereafter, Hayes recommended Dunning's custody be changed to Medium Restrictive Housing.  (Doc. 27-2 at 4).  The warden forwarded Dunning's subsequent request regarding his segregation status to Bonner.  (Doc. 27-4 at 2-3).

As an initial matter, Dunning's claims concerning his reclassification fail because he points to no evidence that any of the named defendants are personally responsible for his placement in segregation, much less that they have the authority to release him from segregation.  Although Dunning notes he was never actually

charged with attempted murder, he does not point to any evidence that the named defendants are authorized to release him from segregation or otherwise change his custody classification.   To the extent Warden Givens, Ms. Bonner, or Hearing Officer Hayes are responsible for Dunning's continued placement in segregation, they are not defendants in this action.

Turning to Dunning's individual claims, "First Amendment rights to free speech and to petition the government for a redress of grievances are violated when a prisoner is punished for filing a grievance concerning the conditions of his imprisonment." *Douglas v. Yates*, 535 F.3d 1316, 1321 (11th Cir. 2008) (internal quotations and citation omitted).   For an inmate to prevail on a retaliatory transfer claim, he must show: (1) he engaged in constitutionally protected conduct; (2) the defendant's retaliatory act adversely affected the protected conduct; and (3) there is a causal connection between the retaliatory act and the adverse effect on the conduct. *Bennett v. Hendrix*, 423 F.3d 1247, 1250 (11th Cir. 2005).   To establish causation, the plaintiff must show the defendants were "subjectively motivated" by his protected activity.  *Smith v. Mosley*, 532 F.3d 1270, 1278 (11th Cir. 2008).

While the First Amendment forbids prison officials from retaliating against a prisoner for exercising free speech, claims alleging unconstitutional retaliation must be factual; mere conclusory allegations of retaliation will not suffice.  *See Hornsby v. Jones,* 188 F. App'x 684, 690 (10th Cir. 2006).  Here, Dunning has presented no

more than conclusory allegations concerning the subjective motivation behind his reclassification; the record is devoid of evidence to support these allegations. Moreover, even if Dunning had presented evidence of retaliatory intent, he has presented no evidence the named defendants were responsible for his reclassification or have the power to remove him from segregation.

The same reasoning applies to Dunning's claims to the extent they assert Fourteenth Amendment due process violations. Of course, Dunning's placement in segregation does not by itself rise to the level of a constitutional violation. *Fulwood v. Fed. Bureau of Prisons*, 568 F. App'x 753, 756 (11th Cir. 2014) ("an inmate has no liberty interest in a particular classification, prison assignment, or transfer, even if he experiences more burdensome conditions than before") (citing *McKune v. Lile*, 536 U.S. 24, 39 (2002)). Even if Dunning did have a liberty interest in his classification, he has not shown these defendants are personally responsible for his placement in segregation or have the authority to release him.

For the foregoing reasons, there is no genuine issue of material fact concerning Dunning's claims regarding his reclassification. The defendants are entitled to judgment as a matter of law on these claims.

## V.    RECOMMENDATION

For all of the foregoing reasons, the undersigned **RECOMMENDS** the defendants' motion for summary judgment be **GRANTED IN PART** and **DENIED**

**IN PART**.  Specifically, the motion is due to be **DENIED** as to Dunning's Eight Amendment Excessive force claim and **GRANTED** as to Dunning's retaliation and due process claims under the First and Fourteenth Amendments; these latter claims are due to be **DISMISSED WITH PREJUDICE**.

## VI.    NOTICE OF RIGHT TO OBJECT

Any party may file specific written objections to this report and recommendation.  A party must file any objections with the Clerk of Court within 14 calendar days from the date the report and recommendation is entered. Objections should specifically identify all findings of fact and recommendations to which objection is made and the specific basis for objecting.  Objections also should specifically identify all claims contained in the complaint that the report and recommendation fails to address.  Objections should not contain new allegations, present additional evidence, or repeat legal arguments.  An objecting party must serve a copy of its objections on each other party to this action.

Failing to object to factual and legal conclusions contained in the magistrate judge's findings or recommendations waives the right to challenge on appeal those same conclusions adopted in the district court's order.  In the absence of a proper objection, however, the court may review on appeal for plain error the unobjected to factual and legal conclusions if necessary in the interests of justice.  11th Cir. R. 3-1.

On receipt of objections, a United States District Judge will review *de novo* those portions of the report and recommendation to which specific objection is made and may accept, reject, or modify in whole or in part, the undersigned's findings of fact and recommendations.  The district judge must conduct a hearing if required by law.  Otherwise, the district judge may exercise discretion to conduct a hearing or otherwise receive additional evidence.  Alternately, the district judge may consider the record developed before the magistrate judge, making an independent determination on the basis of that record.  The district judge also may refer this action back to the undersigned with instructions for further proceedings.

A party may not appeal the magistrate judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit.  A party may only appeal from a final judgment entered by a district judge.

**DONE** this 28th day of October, 2021.

STACI  G. CORNELIUS
U.S. MAGISTRATE JUDGE